**Veneda CART**

v.

**COAL CREEK MINING & MANUFAC-
TURING COMPANY.**

Civ. A. 2994.

United States District Court
E. D. Tennessee,
Northern Division.

March 1, 1957.

Wm. Turnblazer, Middlesboro, Ky., Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn., for plaintiff.

Forrest Andrews, Donaldson, Montgomery & Kennerly, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, District Judge.

This is a suit by plaintiff, Veneda Cart, against the defendant, Coal Creek Mining & Manufacturing Company, to recover damages for the death of her husband, Lawrence Cart, who was killed when the electric shovel that he was operating on November 2, 1955, broke through rock and supporting timbers into an underground mine which was located

on land owned by the defendant and leased to Tennco, Inc., by written lease dated September 25, 1952.

Defendant owns a large boundary of coal lands containing approximately 50,-000 acres located in Anderson, Campbell, Morgan and Roane counties in Tennessee. The mineral rights in approximately 7,000 acres of this area of land were included in the lease to Tennco.

The seam of coal above which the deceased was working at the time of the tragic accident is known as Walnut Ridge. Surface rights to the land covered by the lease were reserved by the lessor. The lessor also reserved the right to inspect from time to time the mining carried on by the lessee. The coal was to be removed by the lessee by the over ground or strip mining process. There were approximately 50 miles of outcrop line on the property covered by the lease. Deep mines had been operated on the property either by Coal Creek or its lessees for a number of years.

O. W. Robinson, a former lessee of Coal Creek, operated a commercial mine entry or tunnel in the Walnut Ridge seam in the year 1948. He removed approximately 2,900 tons of coal from this seam and it was at this mine entry that Lawrence Cart met his death. There were one or two other deep mining entries in this area and three prospecting entries. The prospecting entries were made by Coal Creek. The size of the various entries, or openings, were approximately 8 to 14 feet in width and 6 feet in height. The main entries were made in 1948 and abandoned in 1949. The prospecting entries were made around that time, or at later dates. Robinson did not furnish Coal Creek any map of his workings showing the location of the entry ways, air passages or rooms in the mine. Neither Robinson nor Coal Creek filed any map of the mines with the Chief Inspector of Mines of the State of Tennessee. Coal Creek did not furnish Tennco any map of the mines, but Tennco through its first president, Cheeley, obtained maps from the

Stony Fork Engineering Company, one of which was made by an engineer by the name of Bennett. This map was filed as an exhibit in the record. It was turned over by Cheeley to Mr. Swicher, the present president of Tennco. The present and former officials of Tennco had knowledge of the underground entries on the Walnut Ridge seam of coal, as well as other seams of coal owned by the defendant.

Lawrence Cart began strip mining work in 1947 and continued until the time of his death. He was, therefore, an experienced and capable operator of heavy shovels used in strip mining.

There were no signs or warning signals of any kind at or near the abandoned opening, or tunnel, where the deceased met his death. There is testimony that the entry itself was visible and that there were jack posts, cross-ties and slate near the aperture that were visible. On the contrary, there is testimony that the aperture was covered with vegetation and trees and that the jack posts, cross-ties and slate could not be seen at or near the hole.

On the night of the fatal accident the deceased was working on the 3:00 p. m. to 11:00 p. m. shift. Tennco at that time was operating on a 24-hour basis of three eight hour shifts. The shift that worked from 11:00 p. m. on November 1st until 7:00 a. m. on November 2nd removed the loose dirt, rock, trees, etc., covering a strip of hard rock about four feet thick which covered the coal at the point where the deceased was working at the time of the accident.

A drawing showing the top of the mountain, the high wall, coal pit, ramp and the sheet of rock which was about 30 feet in width and 40 feet in length, the ramp over which the shovel passed to get on the rock, the entry way into which the shovel fell and the overburden to the north of the rock are shown on a drawing which is filed as an exhibit in the record. An examination of this drawing is helpful in understanding the circumstances surrounding the accident.

The shift which worked from 11:00 a. m. to 3:00 p. m. on November 2nd, worked with the shovel on the above described rock but was unable to move it. Some of the members of the crew had drilled holes in the rock for shooting dynamite. The evidence is not clear as to whether or not the holes had been used in shooting dynamite. If shots of dynamite were made they were insufficient to break the rock so that it could be moved with the shovel.

The deceased moved the shovel some 10 to 12 feet in a northerly direction, or toward the overburden at the rock terminus, from the point where it was left stationary by the crew which had worked the shift immediately before the crew of which deceased was a member, began its work. After the deceased moved the shovel approximately 10 or 12 feet, and while he was engaged in moving the overburden (loose rock, dirt, trees, etc.,) north of the solid rock on which the main part of the shovel was located, the rock broke and the shovel descended into the subjacent timber located in the deep mine, or tunnel, thus causing the death of Lawrence Cart.

Plaintiff contends that Coal Creek is liable for the death of her husband because Coal Creek failed to warn Tennco and the employees of Tennco of a hidden danger existing on the land leased by Coal Creek to Tennco, namely, the mine entries and tunnels.

Plaintiff further contends that Coal Creek is liable for the death of her husband because of its violation of Sec. 58-201 of the Code of Tennessee which requires operators of coal mines to make maps of the mines showing all tunnels, entries, etc.

Coal Creek denies that there were hidden dangers not discoverable by ordinary inspection, or that it negligently failed to advise Tennco, lessee, and its employees of the mine entries and tunnels. On the contrary, the defendant says that it advised the lessee and the deceased, and that the lessee advised the deceased of the presence and location of the deep mines, or tunnels.

As further defense to the action, the defendant says:

1. That it was not guilty of any negligence that proximately caused the accident.

2. That deceased knew of the presence and location of the tunnel and by his action in moving the shovel into the place of danger assumed the risk of injury.

3. That deceased was guilty of contributory negligence.

4. That the conduct of deceased amounted to an intervening cause which made the negligence of defendant, if any, remote.

5. That if defendant was negligent, it was a joint-tortfeasor with Tennco; that plaintiff settled with Tennco under the Workmen's Compensation Law of Tennessee, T.C.A. § 50-901 et seq.; that the settlement released Tennco and had the legal effect of releasing defendant, also.

As previously indicated, plaintiff contends that defendant was guilty of negligence per se in that it violated Section 58-201, T.C.A. In this connection plaintiff insists that defendant's violation of this statute precludes it from relying upon the defense that plaintiff assumed the risk of injury in moving the shovel in a place of danger.

Section 58-201 is a part of chapter 2, which is headed, "Maps of Mines."

Section 58-205 provides that the operator of the mine shall furnish the Chief Inspector a copy of the map that Section 58-201 requires of the operator.

Section 58-206 provides that the Chief Inspector shall, at the end of each year, or twice a year if required, forward said map to the owner, operator, or superintendent, whose duty it shall be to place on said map all extensions, worked-out and abandoned parts of the mine that had been completed during the time since the map was last brought up to date and return the map to the mine inspector.

Section 58-207 provides that a copy of the map shall remain in the office of the Chief Mine Inspector, and shall be

transferred by him to his successor in office.

Section 58–208 provides that if the operator of the mine fails to furnish the Chief Mine Inspector with a map, or furnishes an inadequate map, the Chief Mine Inspector in either case is authorized to procure a correct map at the expense of the mine operator.

The chapters immediately following Chapter 2 relating to mining, which include Chapters 3 through 14, all deal with mine operations other than "strip and open pit mines."

Chapter 15 specifically deals with strip mining of the character in which Tennco was engaged at the time of the accident.

It is obvious that when Section 58–201 is read in relation to the various sections of Chapters 2 through 14 of the Code, it refers to deep mining as distinguished from strip mining. This view is strengthened by the fact that Sections 58–1501 through 58–1521 specifically deal with strip and open pit mines.

Section 58–201 covers operators of deep mines rather than owners of the land on which the mines are located. The owners of the land may also be the operators of the mine, hence, the word "owner" is included in the statute. The statute was not passed for the benefit of those engaged in the work in which the deceased was engaged at the time of the accident and defendant's violation of the statute would not create a cause of action in favor of plaintiff. 30 Am.Jur., page 834, secs. 163, 165 et seq.; Indiana & Chicago Coal Co. v. Neal, 166 Ind. 458, 77 N.E. 850, 9 Ann. Cas. 424.

In the absence of a Tennessee statute passed for the safety of strip coal miners that is applicable to the situation surrounding the accident of plaintiff's intestate, it would appear that common law rules governing the relation of landlord and tenant, and the employees of tenants, or lessor and lessee, would apply. Coal Creek leased the premises in a condition which events proved to be dangerous. It was a passive condition but nevertheless a dangerous one, and when acted upon by an employee of the tenant, the danger resulted in the death of the employee. Liability of the landlord, if any, arises from the landlord's negligence, or the violation of a duty owing to the employee.

In Kaylor v. Magill, 6 Cir., 181 F.2d 179, 181, where a factory employee slipped on defective stairs and sued the lessor or landlord, the Court stated the Tennessee law as follows:

"Under the circumstances the general rule of Willcox v. Hines, 100 Tenn. 524, 45 S.W. 781 is applicable as to the landlord. The lease of premises in an unsafe and dangerous condition renders the landlord liable, Willcox v. Hines, supra, cited with approval in Manes v. Hines & McNair Hotels, Inc., 1946, 184 Tenn. 210, 197 S.W.2d 889, to a third party injured thereby, if the landlord knew, or should have known, of the dangerous condition. Stenberg v. Willcox, 96 Tenn. 163, 33 S.W. 917, 34 L.R.A. 615."

In Shuey v. Frierson, 197 Tenn. 235, at page 238, 270 S.W.2d 883, at page 884, where a third party was injured by a door which swung back onto the sidewalk, the court said:

"In the City of Knoxville v. Hargis, 184 Tenn. 262, 198 S.W.2d 555, 558, this Court quoted with approval and adopted as the correct rule of law applicable in cases of the kind now before us the following: 'A lessor of land who transfers the possession thereof in a condition which he realizes or should realize as involving unreasonable risk of bodily harm to others outside the land, is subject to the same liability for bodily harm subsequently caused to them thereby as though he had remained in possession.' * * * Following this quotation other illustrations which hold that the lessor of land is liable for damages even though the land has been leased where the lessor prior to the lease

knows or by exercise of reasonable care should know that he might be subjected to liability by reason of the negligent condition of the leased premises."

While the rule seems clear enough, there is doubt whether this case falls clearly within the rule. Defendant was the owner of coal lands where tunnel mining had been conducted for a number of years, the exact period being immaterial. Entries had been made into the mountain at a number of places, and from the main entries cross-tunnels or "rooms" had opened as the coal was removed from the seam. On top of the tunnels and rooms was the mountain, the over-strata or overburden. Presence of the tunnels and rooms with the existing overburden were not dangerous in themselves, and when the location is considered in the then existing condition no dangerous condition existed. In other words, the location was leased by defendant to the lessee in a condition that was not dangerous.

Presence of the tunnels and rooms did not constitute a "negligent condition." They were the natural results of coal mining in a very common manner. Strip mining could have occurred on virgin coal lands. Facts here show, also, that strip mining can occur on lands where there has already been tunnel mining. On virgin land, a shovel operator could be killed by a rock slide, resulting from the manner in which the shovel was being operated. Over a tunneled seam, a shovel operator could be killed by a break-through of a tunnel, resulting from removal of the overburden by the shovel. In neither case could it be said that danger existed independently of the shovel operations.

In the present case, then, what is the basis for liability?

■■ It is important to note that the landlord is not being sued by the tenant. In a suit of that kind, the lessor is not liable where the tenant is injured by a condition apparent to him or of whose nature he could inform himself by reasonable inspection. The action here is between an employee of the tenant, the employee not being bound by the rule of reasonable inspection. The case is somewhat similar to that where a manufacturer of an article is sued by a user, not by the original buyer. Under that kind of case it is stated: "If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

The analogy is in the unlikelihood of testing or inspection on the part of the third person, here the employees of the strip mining company. By operation of law, the lessor must keep the employees in mind when leasing property, and should inquire of himself whether there is something in or about the leased location which, conjoined with the reasonably to be expected "use", will cause injury to the employees of the lessee. Here there could be no mistaking the use to be made of the location. Strip mining employees would remove the overburden from the coal. In that operation they would sooner or later come in contact, or near contact, with the tunnels.

The coal land was leased with knowledge that strip mining operations were to be conducted on the land. For such operations the tunnels were a hidden danger—if they were hidden. Obviously the lessor could not remove the tunnels. He could not correct defects, as a landlord could do in the repair of a building.

The lessor had a choice between two courses. In the first place, it could have refused to lease the location at all. In the second place, it could lease the land, and assume such liabilities as arose from the leasing. Naturally it had no wish to assume any liabilities for the death of an employee of the lessee. What could defendant lessor have done in order to avoid such liability? As removing the tunnels was a physical impossibility, what was left to be done?

The lessor could have done whatever would have amounted to the exercise of

reasonable care for the safety of anticipated users of the location.

The lessor could have furnished lessee with accurate and explicit maps showing clearly all prospecting entries, deep mine entries and rooms with instructions to the lessee to advise its employees of the precise location of such entries. The proof shows that Coal Creek, lessor, did not furnish Tennco, lessee, any map showing mine entries on the property but that Tennco obtained maps from other sources which did show underground entries, including the underground entry where deceased lost his life. Swicher, president of Tennco, examined the map filed as an exhibit in the record, showing the entries in the Walnut Ridge seam of coal, several times with the deceased. He also discussed the underground entries with the deceased.

Coal Creek, as suggested by the attorneys for plaintiff, could have posted danger signs over each entry. Such signs would have shown with precision the exact location of all entries to Tennco's employees. Danger signs, however, were not placed at the entries.

The record shows that in years prior to the date of the accident there were as many as 81 lessees on defendant's property at one time and that there were approximately 20 lessees on the date of the accident. The proof does not show the number of prospective entries, or mining entries, on the entire 50,000 acres owned by Coal Creek. Presumably, there were many as it was commonly known that the lands had been used by Coal Creek and its lessees for deep mining purposes for a number of years and until comparatively recent years.

■ The defendant was not an insurer of the safety of the deceased. It is only liable for failure to fulfil a duty owed deceased that was the proximate cause of his death.

In Willcox v. Hines and Stenberg v. Willcox, 96 Tenn. 328, at page 331, 34 S.W. 420, at page 421, where a boarder in a house occupied by a tenant was injured by a defective porch, the court said: "The rule laid down does not place upon the landlord the obligation of an insurer or warrantor by contract, nor does it impose the extreme duty of constant care and inspection, but it does impose upon him the duty of reasonable care and diligence to inform himself of the condition of the property which he proposes to let; and if, when he leases, he knows, or by the exercise of reasonable care and diligence should know, that the premises are dangerous, it is his duty to make them safe before he leases, *or inform the tenant of their condition;* and if he does not, he must respond, to any person not in fault, for damages caused by such condition of the premises, whether tenant or third person."

■ The duty to repair or give notice applies where the landlord knows or by the exercise of ordinary care and diligence ought to know of the defect or danger. Willcox v. Hines, supra.

■ The same case is authority for the rule that the tenant as well as the landlord may be liable to an injured third party, negligence of both being shown.

■ Another rule, recognized in this state, is that a person cannot contract away liability for his own negligence. Kaylor v. Magill, supra. Hence, if negligence of the lessor was a proximate cause of the death, liability could not be escaped by any undertaking of the lessee to be responsible for injuries resulting from an existing defect.

In the present case, because of Coal Creek's inability to remove the tunnels and rooms, repair in the sense used in the law of landlord and tenant cannot enter into the picture. The decision must turn on whether Coal Creek fulfilled its duty owed to the deceased, and if not, whether the deceased's alleged contributory negligence bars a recovery to which he otherwise would be entitled.

It is not disputed that Tennco had notice of the underground entries, both prospective and deep mining entries, in

the Walnut Ridge seam of coal in which deceased was working at the time of his death. The president of Tennco went over the map with the deceased, which shows these entries, on various occasions and discussed the entries with the deceased. The general manager of Coal Creek, Mr. Stout, testified unequivocally that he notified the deceased some two or three weeks before the accident of the location of the entry where the accident occurred. At that time the deceased was working about one-fourth of a mile from this entry. Stout's testimony on this point is corroborated by witness Vowell. When Stout told deceased about these entries he replied, "we will find them as we come to them." Deceased passed over one entry with his shovel about 50 or 60 feet from the entry into which the shovel fell. There is proof that he passed over many entries on Coal Creek's land.

The Court is constrained to find from a preponderance of the testimony that Coal Creek fulfilled any and all duties owed to the deceased by calling his attention to the underground entries in the Walnut Ridge seam of coal, including the entry where the accident occurred; that in the light of such knowledge the deceased was guilty of contributory negligence, and that by reason of these findings plaintiff is not entitled to recover.

Brief mention may be made of defendant's contention that plaintiff's acceptance of workmen's compensation released it from liability. This is based on the assumption that Tennco was guilty of proximate negligence, making it a joint-tortfeasor with Coal Creek. Liability under the Workmen's Compensation Law has nothing to do with negligence. Sec. 50–914 specifically provides that the employee or the survivor may collect compensation benefits and also bring an action at law against the third-party tortfeasor. Defendant's contention that acceptance by plaintiff or workmen's compensation benefits is a good defense to her suit, is without merit.

Let an order be presented in conformity with the views expressed herein.